UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GREGORY W.,[1]

    Plaintiff,

    v.

FRANK BISIGNANO,
Commissioner of Social Security,[2]

    Defendant.

Case No. 1:23-cv-2489-MJS

## MEMORANDUM OPINION

Plaintiff Gregory W. ("Mr. W") seeks a ruling that would require the Commissioner of the Social Security Administration ("SSA") to reinstate his widower's benefits. An Administrative Law Judge ("ALJ") determined that Mr. W was not entitled to those benefits because he failed to establish a valid common-law marriage between himself and the decedent, Peggye L. ("Ms. L"). Mr. W's case for reversal rests on a single argument. He contends that the ALJ was bound to follow an order from the D.C. Superior Court's Probate Division that characterized him as Ms. L's "surviving spouse" for estate purposes. The ALJ's failure to do so, Mr. W insists, was clear and reversible error. After careful consideration of the record, the parties' arguments, and the governing law, the Court disagrees. So the Court **DENIES** Mr. W's motion for judgment of reversal (ECF No. 7) and **GRANTS** the Commissioner's cross-motion for judgment of affirmance (ECF No. 8).

---

[1] Plaintiff's name has been partially redacted in keeping with the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States. *See* Memorandum, PRIVACY CONCERN REGARDING SOCIAL SECURITY AND IMMIGRATION OPINIONS 3 (May 1, 2018), *available at* https://www.uscourts.gov/sites/default/files/18-ap-c-suggestion_cacm_0.pdf (encouraging the use of "only the first name and last initial" in Social Security cases).

[2] Effective May 7, 2025, Frank Bisignano became the Commissioner of the Social Security Administration, so he is automatically substituted as the defendant under Fed. R. Civ. P. 25(d).

## BACKGROUND

Mr. W and Ms. L began their relationship in the early 1990s. From that time until Ms. L's death, they lived together continuously—first in Atlanta, Georgia, then in Suitland, Maryland, and ultimately in Washington, D.C., where they signed an apartment lease together in December 2013. (ECF No. 5, Administrative Record ("AR") at 242–325.)[3] Mr. W and Ms. L never officially married, but they reportedly held themselves out as common-law spouses to family and friends.

Ms. L passed away in June 2015 in the District of Columbia. (AR at 78.) She was survived by Mr. W, as well as several siblings. (*Id.* at 141–44.) Ms. L did not leave a will, and neither did she designate a beneficiary for her life insurance policy. Following her death, Mr. W submitted a claim for Ms. L's life insurance benefits as her "[c]ommon law husband" (AR at 157), and the insurance company ultimately determined that Ms. L's "siblings [were] not the appropriate payees" and issued a check to Mr. W in October 2015 for the proceeds of the policy (*id.* at 152, 282).

A few months later, Mr. W initiated probate proceedings in D.C. Superior Court. He petitioned for his appointment as the personal representative for Ms. L's estate, indicating that as the "spouse of the decedent," he had priority to serve as the personal representative and there were "no other parties in higher priority." (AR at 362–65.) The petition made no mention that Mr. W's spousal status was premised on common-law marriage. (*See id.*) The probate court originally denied the petition without prejudice, reasoning that although "the petitioning spouse ha[d] priority to serve … he [was] ineligible to do so" under D.C. Code § 20-303(b)(4) due to a prior criminal conviction. (*Id.* at 369–71.) Instead, the probate court suggested that one of Ms. L's brothers had priority to serve. (*Id.* at 371.)

---

[3] Page citations to the AR refer to the running pagination at the upper right margin. Page citations to the parties' briefing, by contrast, refer to the ones assigned by the Court's electronic filing system.

Mr. W then filed an amended petition in April 2017 accompanied by a criminal-history report that seems to have been intended to assuage the probate court's original concerns. (AR at 373–78.) Mr. W again identified himself as the "surviving spouse of the decedent," but again without any reference to common-law marriage. Moreover, although the petition listed one of Ms. L's siblings as an "interested person" and "brother," when asked to indicate the decedent's survivors earlier in the same form, Mr. W only checked the box for "Spouse/Domestic Partner" and not for "Brothers and/or Sisters." (*Id.* at 375.)

In July 2017, the probate court issued its final order, wherein it appointed Mr. W as the personal representative of the estate and directed that Mr. W would inherit Ms. L's property as "the surviving spouse of the decedent, in accordance with law." (AR at 396–97.) The full contents of order spanned barely a page, and the order did not include any reference to Mr. W's claim of common-law marriage or a single sentence of reasoning to support the statement that Mr. W was the "surviving spouse," whether by common-law marriage or otherwise. (*Id.*) It is this probate order that Mr. W argues was binding on the ALJ for purposes of his claim to widower's benefits.

About a year before her passing, Ms. L had applied for—and was granted—retirement insurance benefits from the SSA. (AR at 70.) The Social Security Act allows for surviving spouses to essentially inherit those benefits upon a showing that the claimant is the decedent's legal partner under state law and that the relationship lasted longer than nine months at the time of the decedent's passing. 42 U.S.C. §§ 402(f), 416(g)(1)(E), 416(h)(1)(A); *see* 20 C.F.R. §§ 404.335, 404.345. So, while Mr. W was going through the probate process, he applied for widower's benefits on the attestation that he and Ms. L were in a common-law marriage.

On May 16, 2017, the SSA originally granted his application, finding Mr. W eligible for widower's benefits starting on April 2017. (AR at 65.) But because Mr. W had applied for benefits

in December 2016, he submitted a request for reconsideration asking for that earlier date as the starting clock for his benefits entitlement. (*Id.* at 67.) Mr. W's submission apparently prompted a closer review of the original application, and the SSA reassessed its determination. (*Id.* at 68–78.) In May 2018, the SSA sent Mr. W a notice of change in benefits that explained his "widower claim has been reopened to a denial" because "there [was] not enough evidence to support a finding of common-law marriage." (*Id.* at 81–84.) Given that new determination, the notice further advised Mr. W that he owed about $8,500 back to the SSA as overpayment fees on those benefits. (*Id.*)

From there, represented and supported by legal counsel, Mr. W unsuccessfully sought reconsideration. (AR at 98–99; *id.* at 104.) The matter proceeded to an administrative hearing before an ALJ in September 2021. (*Id.* at 32–64.) At the hearing, and in response to arguments from Mr. W's counsel, the ALJ acknowledged that the SSA "didn't consider" the probate court's order originally. (*Id.* at 46.) So, after the hearing, the ALJ requested additional evidence. (*See id.* at 135–36 (seeking all submissions to the probate court, Ms. L's death certificate, tax records, any statements from Ms. L's siblings, and any documents regarding prior marriages or divorces).)

In January 2022, the ALJ issued his decision. The ALJ found that Mr. W failed to establish he was in a common-law marriage with Ms. L under the laws of the District of Columbia, so he was not entitled to widower's benefits. (*Id.* at 9–31.) Relevant here, the ALJ concluded that he did not have to adhere to the probate order's statement that Mr. W was a "surviving spouse." (*Id.* at 26–27.) Instead, through what was essentially a *de novo* review of the validity of the claimed common-law marriage, the ALJ found the evidence insufficient to support such a finding.

The ALJ's decision discussed and summarized the evidence on both sides. As for the evidence that supported Mr. W's claim, the ALJ highlighted the following points (among others):

4

- Evidence that Mr. W and Ms. L "cared for each other, had a loving relationship, [and] were together for some periods in several jurisdictions over a long period of time."

- "[T]estimony from [Mr. W] and general statements from his friends and relatives that he and [Ms. L] were married or considered themselves such."

- Evidence that Mr. W "was able to obtain an insurance benefit and convince a court to allow him to administer her small estate[.]"

- Evidence that Mr. W and Ms. L "years ago wrote notes with pet names including husband and wife."

(AR at 27 (summarizing these points); *id.* at 43, 50, 151–69, 185–94, 338–57, 396–97.) As for the evidence pointing the other way, the ALJ highlighted the following points (among others):

- The absence of evidence from any "blood relative" of Ms. L in support.

- Ms. L's application for retirement benefits in July 2014—less than a year before her passing—where she advised the SSA that she was not married.

- Mr. W's application for retirement benefits in January 2013, where he likewise advised that SSA that he was not married.

- Ms. L's death certificate listed her marital status as "Divorced."

- The absence of any tax records showing either Mr. W or Ms. L as holding themselves out as married for any period of time.

(AR at 27 (summarizing these points); *id.* at 70, 71, 78.) On balance, the ALJ ultimately concluded that "the preponderance of the evidence" demonstrated that Mr. W and Ms. L "were not marr[ied] under the common law of Washington D.C." (*Id.* at 28.)

On June 22, 2023, the SSA's Appeals Council denied Mr. W's request for review, rendering the ALJ's decision final. (*Id.* at 1.) At that point, Mr. W timely sought judicial review. 42 U.S.C. § 405(g). He asks the Court to reverse and award him widower's benefits or, alternatively, remand for reconsideration. (*See* ECF No. 7-1 ("Pl.'s Mem."); ECF No. 10 ("Pl.'s Reply").) The

5

Commissioner filed a cross-motion to affirm. (*See* ECF No. 8 ("Def.'s Mem.").) Both motions are fully briefed and ripe for decision. This ruling now follows.[4]

## LEGAL STANDARD

"The Commissioner's 'ultimate determination' about entitlement to benefits 'will not be disturbed if it is based on substantial evidence in the record and correctly applies the relevant legal standards.'" *Cox v. Kijakazi*, 77 F.4th 983, 990 (D.C. Cir. 2023) (quoting *Butler v. Barnhart*, 353 F.3d 992, 1000 (D.C. Cir. 2004)). In other words, the Court reviews the Commissioner's denial of benefits to determine whether it was supported by substantial evidence and free of legal error.

Substantial evidence "means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (citations and quotation marks omitted); *see also Butler*, 353 F.3d at 999 (describing substantial evidence as "more than a scintilla, but … less than a preponderance"). The Court must "carefully scrutinize" the record for substantial evidence, but it may not reweigh the evidence considered, *Cunningham v. Colvin*, 46 F. Supp. 3d 26, 32 (D.D.C. 2014) (quotation marks omitted), as the Court's review is "highly deferential to the agency fact-finder," *Rossello ex rel. Rossello v. Astrue*, 529 F.3d 1181, 1185 (D.C. Cir. 2008) (citing *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)). However, an ALJ must build an "accurate and logical bridge from the evidence" to their conclusion so the Court can assess whether a connection exists between the record evidence and the ALJ's conclusions. *Lane–Rauth v. Barnhart*, 437 F. Supp. 2d 63, 67 (D.D.C. 2006) (quoting *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002)). As to the "relevant legal standards," the Court reviews "any questions of law … *de novo*." *Cox*, 77 F.4th at 990 (citation omitted).

---

[4] Because the issues are adequately presented in the parties' briefing, the Court declines Plaintiff's request for oral argument and exercises its discretion to rule on the motions without a hearing. LCvR 7(f).

6

**DISCUSSION**

To qualify for widower's benefits under the SSA, the claimant must establish he was validly married to the decedent. 42 U.S.C. §§ 402(f), 416(g)(1), 416(h)(1)(A); 20 C.F.R. §§ 404.335, 404.345. This determination is based on the law of the state where the decedent "had a permanent home" at death. 20 C.F.R. § 404.345. Here, that is the District of Columbia.

As both sides frame this case, it presents one discrete and relatively narrow legal question: in assessing whether Mr. W was entitled to widower's benefits based on a common-law marriage to Ms. L, was the ALJ required to treat the probate court's "surviving spouse" finding as controlling? Mr. W insists the answer to that question is an affirmative one. The Commissioner disagrees, rejoining that the ALJ appropriately treated the probate order as one component piece of probative evidence alongside the broader evidence submitted at the administrative hearing.[5]

The D.C. Circuit has not directly addressed the weight owed to state-court judgments in the Social Security context. But other courts recognize that the SSA generally has "no constitutional compulsion to give full faith and credit to a state court judgment, nor is it bound by the judgment under principles of res judicata." *Warren v. Sec'y of Health & Hum. Servs.*, 868 F.2d 1444, 1446–47 (5th Cir. 1989) (cleaned up); *see also Cain v. Secretary of Health, Education and Welfare*, 377 F.2d 55, 58 (4th Cir. 1967) (similar). Both parties, however, acknowledge an exception to this general proposition, captured by Social Security Ruling ("SSR") 83-37c, 1983 WL 31272 (1983). SSR 83-37c incorporates the Sixth Circuit's decision in *Gray v. Richardson*, which laid out a rule for when the SSA "is not free to ignore an adjudication of a state trial court."

---

[5] Mr. W describes the narrow complexion of the case in these terms. (*See* Reply at 2 ("This appeal solely concerns whether the D.C. court decision was binding on the ALJ on a question of state law[.]").)

7

474 F.2d 1370, 1373 (6th Cir. 1973). Specifically, *Gray* held that the SSA must adhere to a state-court decision as binding on a particular issue when four elements are met:

> (1) An issue in a claim for social security benefits previously has been determined by a State court of competent jurisdiction; (2) this issue was genuinely contested before the State court by parties with opposing interests; (3) the issue falls within the general category of domestic relations law; and (4) the resolution by the State trial court is consistent with the law enunciated by the highest court in the State.

*Id.* According to Mr. W, the probate order met all these elements here. The Commissioner says otherwise. The Court agrees with the Commissioner.

As an initial matter, there is no disagreement that the first and third elements are met. On the first, the D.C. Superior Court's Probate Division is a "court of competent jurisdiction" to adjudicate the question of whether Mr. W qualifies as Ms. L's surviving spouse in the context of administering an estate pursuant to D.C. law. *See* D.C. Code § 20-303; *see also, e.g.*, *In re Estate of Jenkins*, 290 A.3d 524, 526 (D.C. 2023). And on the third, the relevant facet of the probate court's order focuses on an issue—*i.e.*, marriage—that falls into the general category of domestic relations law. The Commissioner does not dispute these two elements. So that leaves the parties' disagreement over the second and fourth elements. The Court takes each in turn.

**I.    Genuinely Contested**

Start with whether the relevant issue was "genuinely contested" before the probate court. According to Mr. W, this element is met because his "status as personal representative was genuinely contested by the D.C. probate court." (Pl.'s Mem. at 7.) As he tells it, the "proceedings were not pro forma," including because the probate court initially held him "ineligible because of a prior … conviction and found Ms. L[]'s brother had priority" on that basis, before ultimately appointing Mr. W to that role. (*Id.* at 7–8.) Those points are true as far as they go. But as the Commissioner rightly points out (Def.'s Mem. at 17), they elide the real issue: whether the validity

8

of the common-law marriage between Mr. W and Ms. L was genuinely contested, in adversarial terms, in the probate court. And on that point, the record simply does not show that it was.

Recall *Gray*'s articulation of this element: whether the "issue was genuinely contested before the State court by parties with opposing interests." *Gray*, 474 F.2d at 1373. The facts of *Gray* help elucidate its meaning. *Gray* centered on the legitimacy of a decedent's child and her resulting eligibility for benefits. The underlying state-court ruling at issue arose from a contested divorce proceeding before the decedent's death, through which the child's mother insisted the decedent was the child's father, and the decedent vigorously contested that point—including by denying sexual relations with the mother during the relevant time, claiming sterility, and more. *See id.* at 1371–72. Through that contested and adversarial proceeding, the Ohio state court expressly found that the child was the decedent's child. *See id.* Against that backdrop, the Sixth Circuit held that the SSA "should have accepted the determination made by the State court." *Id.* at 1373.

The facts here are quite different. For starters, there is nothing in the record to show that any adversary or opposing party appeared in the probate court to contest Mr. W's eligibility as personal representative of the estate, let alone his status as Ms. L's common-law husband. While the probate court initially noted that one of Ms. L's brothers had "priority" to serve as personal representative because of Mr. W's prior conviction, there is no indication that the brother ever appeared in the proceedings to challenge Mr. W's claim.[6] Beyond that, Mr. W's suggestion that the probate court itself interrogated his status as Ms. L's surviving-spouse—whether based on common-law marriage or otherwise—likewise finds no support in the record. The fact that the probate court initially denied his eligibility as personal representative on an entirely separate basis

---

[6] Mr. W does state that Ms. L's brother "was involved" in the probate proceedings insofar as he "obtained reimbursement for funeral expenses" (Pl.'s Mem. at 8), but it does not necessarily follow that he was actively involved in the court process or that he contested Mr. W's surviving-spouse status in any sense.

9

(his criminal record)—a basis that is not at all inconsistent with Mr. W being Ms. L's surviving spouse—does not show otherwise.[7] More, the probate court's final order does not reflect in any sense that the court engaged with or was even aware of the common-law marriage question in the proceedings. There are no findings to that effect or even any mention of the issue. On this record, then, Mr. W fails to show that the validity of his common-law marriage with Ms. L was "genuinely contested" for purposes of the probate court's order identifying him as a "surviving spouse."

The caselaw solidifies this takeaway. *Gray* itself distinguished two cases on the basis that they involved "*ex parte* State trial court decisions." *Gray*, 474 F.2d at 1373 ("We reemphasize that the divorce decree which adjudicated [the child] to be the lawful issue of the marriage of her mother and [the decedent] was rendered in a contested proceeding."). While the probate court case here was not handled *ex parte*, it was also nowhere close to a "contested proceeding," and certainly not one focused on the issue of whether Mr. W was Ms. L's common-law husband. Other courts, moreover, have reached similar conclusions in similar contexts. *See also, e.g.*, *George v. Sullivan*, 909 F.2d 857, 861 (6th Cir. 1990) (finding *Gray* factors unmet where the underlying divorce decree was not genuinely contested in state court, including because there was "no indication that any evidence was presented [on the issue] or that any material controversy was resolved"); *Outwater v. Sec'y of Health & Human Servs.*, 894 F. Supp. 1114, 1120 (E.D. Mich. 1995) (same, where the state court proceedings did not reflect "a genuine contest with respect to a determination that [a child] was the sole heir at law"); *Tomasello v. Apfel*, 165 F.3d 33 (Table), 1998 WL 597643, at *2

---

[7] The Court is mindful that the ALJ did observe that the probate case "was not an easy, uncontested matter." (AR at 25.) But the use of "uncontested" in that context is not how that term is understood for purposes of the *Gray* test. In context, the ALJ seems to have been commenting on the fact that Mr. W's petition was originally denied on the basis of his prior criminal conviction, not that any adversarial party—or even the probate court itself—"contested" or pushed back on Mr. W's claim as Ms. L's surviving spouse.

10

(7th Cir. 1998) (explaining that when a state-court "order is not the product of truly adversarial proceedings, there is good reason to question its reliability").

These same principles apply here. Mr. W has not shown that his marriage to Ms. L (common-law or otherwise) was genuinely contested in the probate court proceedings.[8] On this basis alone, then, the ALJ was not bound by the probate order under *Gray* and SSR 83-37c.

## II.   Consistent With The Law

Next, even assuming *arguendo* that the validity of Mr. W's marriage to Ms. L had been genuinely contested in the probate proceedings, the Court would still conclude that the ALJ was not bound by the probate order because that order does not set forth any reasoning or findings to show that its characterization of Mr. W as a surviving spouse is "consistent with the law."

To reiterate, Mr. W's claim of surviving-spouse status—and, in turn, his claim to widower's benefits from the SSA—is premised on a theory of common-law marriage. Under D.C. law, "[t]he elements of common-law marriage are 'cohabitation following an express mutual agreement, which must be in words of the present tense, to be permanent partners with the same degree of commitment as the spouses in a ceremonial marriage.'" *Estate of Jenkins*, 290 A.3d at 528 (quoting *Gill v. Nostrand*, 206 A.3d 869, 875 (D.C. 2019)). "Proof of cohabitation alone will not suffice to prove the existence of a common law marriage." *Bansda v. Wheeler*, 995 A.2d 189, 198 (D.C.

---

[8] The policy underlying this rule is borne out in other contexts, too. For instance, federal courts asked to apply collateral estoppel (*i.e.*, issue preclusion) ask whether the relevant issue was "actually litigated and determined" in the prior proceeding. *See Gates v. Dist. of Columbia*, 66 F. Supp. 3d 1, 13 (D.D.C. 2014) ("Issue preclusion attaches only to issues or questions of fact actually litigated and determined, not those that merely lurk in the record before the court.") (citation and quotation omitted). Similarly, for res judicata (*i.e.*, claim preclusion), courts ask whether there was a prior "adversarial process" that led to the earlier ruling. *Capitol Hill Grp. v. Pillsbury, Winthrop, Shaw, Pittman, LLC*, 569 F.3d 485, 491 (D.C. Cir. 2009). The same holds true where a court is asked to take judicial notice of the factual findings of another tribunal. *Baxter v. Islamic Republic of Iran*, 2025 WL 689217, at *13 (D.D.C. Mar. 4, 2025) (emphasizing how the "adversarial process … sharpen[s] the issues"). These principles apply similarly here in this context.

11

2010). And, importantly here, the D.C. Court of Appeals has cautioned that "claims of common law marriage should be closely scrutinized, especially where one of the purported spouses is deceased and the survivor is asserting such a claim to promote his financial interest." *Coates v. Watts*, 622 A.2d 25, 27 (D.C. 1993).

On this element of the *Gray* test, the question is whether the probate court resolved the issue "consistent with the law enunciated" by the D.C. Court of Appeals. According to Mr. W, the Commissioner's position boils down to "nothing more than the fact that the SSA disagrees with" the probate court's decision. (Pl.'s Reply at 3.) In other words, Mr. W contends that so long as the probate court applied the proper legal framework, it is not enough for the Commissioner (or ALJ) to decide that it would reach a different result if applying that legal framework in the first instance. On this much, the Court agrees. But the problem for Mr. W is that the record does not reflect in any way that the probate court ever applied the governing D.C. law on common-law marriage before identifying Mr. W as a "surviving spouse," or that the probate court was even attuned to the issue of common-law marriage at all. At most, Mr. W points out that the probate order says he is the "surviving spouse of the decedent, *in accordance with law*." (Pl.'s Mem. at 4 (emphasis added) (citing AR at 145–48).) But as the Commissioner rightly rejoins (Def.'s Mem. at 15), that sort of *ipse dixit* is simply too thin a reed. Beyond that, the one-page order does not make any mention of Mr. W's claim to common-law marriage, and it certainly does not contain any legal reasoning or factual findings to reflect that the court applied D.C. law to conclude that Mr. W established a valid common-law marriage that rendered him a "surviving spouse." (AR at 146–47.)

In some ways, this is understandable because, at least from this Court's review of the probate petition and the accompanying probate-related records, it is not clear that Mr. W ever put that issue in front of the probate court. Neither of his petitions mentioned common-law marriage,

and none of the accompanying documents (at least not the ones in the record before this Court) referenced that point either. Instead, the probate court appears to have taken Mr. W's surviving-spouse claim at face value.[9] In any case, the absence of any findings or analysis on the issue of common-law marriage in the probate order—or any other probate court records—precludes Mr. W from demonstrating that the probate court decided the common-law marriage issue in his favor "consistent with the law enunciated by" the D.C. Court of Appeals. *Gray*, 474 F.3d at 1373; *see also Outwater*, 894 F. Supp. at 1120 (concluding that "complete deference" to a probate court ruling was not required where it did not include any findings under applicable state law).

Accordingly, the fourth *Gray* element is unsatisfied, which means the ALJ was not required to defer to the probate court's statement that Mr. W was a surviving spouse.

## III. Remaining Issues

The Court closes with two final points.

First, Mr. W faults the ALJ for failing to expressly engage with the *Gray* factors in denying his claim for benefits. In fact, Mr. W suggests the ALJ's decision must be reversed on this basis alone, irrespective of what the output of that analysis might demonstrate. (Pl.'s Mem. at 7.) Not so. For one thing, even though he was represented by counsel during the hearing, the record does not show that Mr. W ever squarely argued to the ALJ that the Commissioner was bound by the probate court's determination on the surviving spouse question under *Gray* or SSR 83-37c. (Instead, it appears that Mr. W—again, through counsel—surfaced that theory for the first time in

---

[9] In fact, the probate court's order stated that it was issued based on "consideration of the petition … and the representations made therein." (AR at 396.) And the only salient facts in the petition are that: (1) Mr. W and Ms. L are listed at the same address, and (2) Mr. W also characterizes himself as Ms. L's spouse. (*Id.* at 373.) Accordingly, even construing the probate records in the most charitable light to Mr. W, these appear to have been the only facts relevant to common-law marriage before the probate court. And as noted, "[p]roof of cohabitation alone will not suffice[.]" *Bansda*, 995 A.2d at 198.

13

his appeal of the ALJ's decision to the SSA Appeals Council (*see* AR at 137–38).) Even if not strictly an instance of forfeiture or waiver, it is somewhat disingenuous for Mr. W to fault the ALJ so heavy-handedly for not addressing an issue that was never presented to him. In any case, as the discussion above demonstrates, the record shows regardless that Mr. W did not—and could not—satisfy the second and fourth elements of the *Gray* test and SSR 83-37c. So even if it were error for the ALJ to fail to explicitly engage with the four-element test under *Gray* and SSR 83-37c, that error was harmless and does not warrant reversal. *Saunders*, 6 F.4th at 4 ("[E]ven if we perceive error, we will affirm the Commissioner's decision unless the error is prejudicial.").

Second, because the ALJ was not determinatively bound by the probate order's "surviving spouse" language to resolve the question of whether Mr. W established a valid common-law marriage with Ms. L under D.C. law, that means the ALJ was simply expected to treat the probate order as one piece of probative evidence relevant to Mr. W's claim, alongside the other evidence in the record. The substance of the ALJ's decision reflects that he did so. (*See* AR at 25–27.) This would leave Mr. W with the prospect of a "substantial evidence" challenge to the ALJ's analysis of the common-law marriage issue, at most. But he does not press such a challenge. To the contrary, Mr. W expressly indicates that "is not the relevant issue in this appeal" and acknowledges that there was "substantial evidence on both sides." (Pl.'s Reply at 2.) In other words, the Court's resolution of the legal import of the probate order is sufficient to resolve Mr. W's appeal.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Mr. W's motion for judgment of reversal (ECF No. 7) and **GRANTS** the Commissioner's cross-motion for judgment of affirmance (ECF No. 8). The Court will issue a separate order so stating.

Dated: October 14, 2025

                                                      MATTHEW J. SHARBAUGH
                                                      United States Magistrate Judge